RANDY S. GROSSMAN
United States Attorney
VIVIAN SAPTHAVEE
Assistant United States Attorney
CA State Bar No. 338388
NICOLE BREDARIOL
Special Assistant United States Attorney
Massachusetts State Bar No. 696484
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7696
Email: vivian.sapthavee@usdoj.gov
Email: Nicole.bredariol@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OSCAR RAMIREZ-ALEMAN,<br><br>Defendant. | Case No.:  21-CR-3403-BEN<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT PURSUANT TO *ARLINGTON HEIGHTS*** |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Vivian Sapthavee and Nicole Bredariol, Assistant United States Attorneys, hereby files its Response in Opposition to Defendant's Motion to Dismiss Indictment Under *Arlington Heights*.  This response is based upon the files and records of the case.

//
//
//
//
//

## INTRODUCTION

Defendant is charged in an Indictment with violating 8 U.S.C. § 1326(a) and (b). Relying on *Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977), he contends that the Indictment must be dismissed because it violates the Constitution.

The Court should reject Defendant's claim that § 1326[1] violates the Equal Protection Clause because it does not meet the heightened scrutiny called for by *Arlington Heights*, which allows courts to consider legislative intent when resolving an equal protection challenge. His reliance on *Arlington Heights* is misplaced because *Arlington Heights* is inapplicable here. Supreme Court and Ninth Circuit case law have established that rational basis scrutiny applies to equal protection challenges to Federal immigration laws, and § 1326 easily meets this standard. But even were the Court to apply *Arlington Heights*, Defendant has failed to come forward with a persuasive argument to dismiss the charge. The Immigration and Naturalization Act of 1952 (1952 INA) contained the law that was later codified as § 1326. But rather than rely on the legislative history for the 1952 INA to attempt to make his point concerning racial animus, Defendant urges the Court to deem § 1326 unconstitutional based on only a portion of the legislative history for the Undesirable Aliens Act of 1929 (1929 UAA), which the 1952 INA replaced, and on another court's findings of fact concerning the 1952 INA. Defendant's motion should be denied.

## STATEMENT OF FACTS

On November 25, 2021, at approximately 1:30 a.m., U.S. Border Patrol Agent ("BPA") Raymond A. Gomez was performing his assigned duties at the San Clemente Border Patrol Station when he was asked to assist with a maritime smuggling event. U.S. Coast Guard Cutter HADDOCK had apprehended and detained a vessel with

---

[1] Defendant claims that both § 1325 and § 1326 are unconstitutional. However, since Defendant is only charged with a violation of § 1326 this response will only address the arguments regarding the constitutionality of § 1326.

approximately 26 individuals onboard approximately 11.5 nautical miles west of La Jolla, San Diego, California.

When BPA Gomez arrived on scene to an area approximately 13 miles north of the United States/Mexico International Boundary line and several miles west of the San Ysidro, California Port of Entry, he identified himself to the 26 individuals as a U.S. BPA and conducted immigration inspections in both English and Spanish. Defendant Oscar Ramirez-Aleman ("Defendant"), who was one of the 26 individuals, stated that he was a citizen of Mexico without documents allowing him to enter or remain in the United States legally. At approximately 3:15 a.m., BPA Gomez placed all 26 individuals, including Defendant, under arrest.

At approximately 11:02 a.m., at the San Clemente Border Patrol Station, BPAs Matthew Bortnem and Jose L. Pineda advised Defendant of his *Miranda* rights. Defendant elected to waive his rights and make a statement, which was video-recorded. During the interview, Defendant stated he was a Mexican citizen and was born in Veracruz, Mexico in 1982. Defendant also stated that both his mother and father were Mexican citizens. Defendant told the BPAs that he entered the United States by vessel on November 24, 2021. Defendant also acknowledged that he lacked any documents that would allow him to enter or remain in the United States legally and was not inspected by an immigration officer. Defendant said he intended to seek work in California, and he also told BPAs that he had previously been ordered deported in the past and that he had not sought permission to re-enter the United States after his removal.

Defendant has been deported or removed from the United States approximately two times. He was first ordered deported on September 21, 2012 and was most recently removed on May 4, 2018.

## ARGUMENT

Defendant contends that the Indictment must be dismissed because § 1326 violates the Equal Protection Clause. His reliance on *Arlington Heights* is misplaced because

3

rational basis scrutiny applies, and § 1326 easily satisfies this lower standard.   *See, e.g.,* *United States v. Sanchez-Rodriguez*, Case No. 21-CR-2351-TWR (S.D. Cal Sept. 20, 2021). Moreover, even if the *Arlington Heights* test applies, Defendant's argument lacks merit.

**I.     The Court Should Deny Defendant's Motion To Dismiss Because § 1326 Survives Rational Basis Scrutiny**

**A.     Rational Basis Scrutiny Applies**

It is well settled that Congress has "plenary power" over immigration matters. *Kleindeinst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. I.N.S.*, 387 U.S. 118, 123 (1967)); *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) ("Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks and citation omitted))).   Because Congress's actions regarding "the power to expel or exclude aliens" is "largely immune from judicial control," *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953), only "narrow judicial review" is permitted in the immigration context.  *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *accord Fiallo*, 430 U.S. at 792; *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976).

The scope of this judicial review was discussed in *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972).  In addressing a constitutional challenge to the denial of a visa to a proposed speaker at a conference, the Supreme Court limited its review to whether any "facially legitimate and bona fide" reasons existed for the denial.  *Id*.  The Court instructed that when such a reason is found, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against [constitutional] interests [of citizens]."   *Mandel*, 408 U.S. at 770; *accord Fiallo*, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision."). For decades, the Supreme Court's "opinions have reaffirmed and applied [*Mandel's*] deferential standard of review across different contexts and constitutional claims" concerning Federal immigration law.  *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018).

This standard of review is the equivalent of rational basis review.  *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (citations omitted).

In fact, the Ninth Circuit's *en banc* decision in *Ledezma-Cosino* confirmed that rational basis scrutiny applies specifically to equal protection challenges to Federal immigration law.  The Court stated that "we have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context[,]" and to support this statement, the appeals court quoted the portion of *Hernandez-Mancilla v. Holder* in which the court stated, "***We review equal protection challenges to federal immigration laws under the rational basis standard[.]***"  633 F.3d 1182, 1185 (9th Cir. 2011) (emphasis added), *quoted in Ledezma-Cosino*, 857 F.3d at 1049; *see also United States v. Sanchez-Rodriguez*, Case No. 21-CR-2351-TWR, ECF No. 29 at 1 (S.D. Cal. Sept. 20, 2021) ("The Court finds that the rational basis test applies to Defendant's motion.").

## B. *Arlington Heights* Does Not Apply

A review of *Arlington Heights* jurisprudence further shows that it has no applicability to a challenge to a Federal immigration law.  Defendant's theory is that a law may violate the Equal Protection Clause if a legislature enacts "a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group."  Def. Mot. at 5 (citing *Arlington Heights*, 429 U.S. at 265-68).  As an initial matter, the nature of the cases applying *Arlington Heights* that Defendant cites is completely different from a criminal immigration statute like § 1326.  As shown in the bulleted summaries below, none of the cases on which Defendant relies to argue for the application of *Arlington Heights*[2] involved challenges to any Federal immigration statutes.

---

[2] Defendant cites *Ramos v. Louisianna*, 140 S. Ct. 1390 (2020) early in his brief, which had to do with whether a criminal conviction by a nonunanimous jury is an unconstitutional denial of the Sixth Amendment right to a jury trial. Notably, this decision never references *Arlington Heights*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- *Arlington Heights* resolved a challenge brought under the Equal Protection Clause of the Fourteenth Amendment to the denial of a rezoning request that was found to be racially discriminatory. 429 U.S. at 254-60.

- *Arce v. Douglas* referred to *Arlington Heights* in considering First- and Fourteenth-Amendment claims regarding an Arizona law that eliminated a Mexican-American Studies program in Tucson public schools. 793 F.3d 968, 973, 977-81 (9th Cir. 2015).

- *Hunter v. Underwood* applied *Arlington Heights* to a Fourteenth Amendment equal protection challenge to a provision of the Alabama state constitution that was enacted in 1901 and that disenfranchised individuals convicted of misdemeanors involving moral turpitude. 471 U.S. 222, 225-33 (1985).

Defendant also cites *Democratic National Committee v. Hobbs*, which had to do with an Arizona law that allegedly violated the Voting Rights Act of 1965 and the First, Fourteenth, and Fifteenth Amendments. 948 F.3d 989, 998, 1038-42 (9th Cir. 2020) (en banc). The Ninth Circuit struck down the law after applying *Arlington Heights*. *Hobbs*, 948 F.3d at 1038-42. Defendant, however, fails to alert this Court that the Supreme Court reversed judgment. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).[3] Defendant also fails to alert this Court that the Supreme Court stated that the "'cat's paw' theory has no application to legislative bodies," *Id.*, which is a theory Defendant invokes in his brief (and is one discussed below). Def. Mot. at 8, 18.

In any event, Defendant does not identify any Supreme Court or Ninth Circuit decisions in which *Arlington Heights* was applied to a Federal immigration law. This is unsurprising. As previously argued, before *Arlington Heights* was decided, the Supreme Court established that rational basis is the level of scrutiny that applies to constitutional challenges in the immigration context. *Mandel*, 408 U.S. at 769. And since *Arlington*

_____

[3] In response to similar motions to dismiss the United States has briefed that the Supreme Court reversed judgment regarding the "cat's paw doctrine" since at least August 2021. However, Defendant still relies on this outdated case.

*Heights* was decided, the Supreme Court and the Ninth Circuit both have iterated that rational basis scrutiny applies to challenges to immigration laws, including equal protection challenges.  *E.g.*, *Trump*, 138 S. Ct. at 2419; *Ledezma-Cosino*, 857 F.3d at 1049.  The fact that both before and after *Arlington Heights* was decided, the Supreme Court and Ninth Circuit were consistent in stating that rational basis scrutiny applies in the immigration context is a strong indicator that *Arlington Heights* does not apply in this case.

Another strong indicator that *Arlington Heights* is inapplicable to Defendant's challenge is that the Supreme Court made clear both before and after it decided *Arlington Heights* that courts are not permitted to inquire into Congress's motives for enacting immigration laws.  *Fiallo*, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision [concerning immigration]."); *Trump*, 138 S. Ct. at 2419 ("the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of United States citizens (citing *Mandel*, 408 U.S. at 770)).  In contrast to the bright-line rule that inquiry into Congress's motives is not permitted when resolving constitutional challenges to immigration statutes, *Arlington Heights* **demands** this type of far-reaching inquiry.  429 U.S. at 266-67.  Again, the consistent treatment of the scope of judicial review of Federal immigration laws both before and after *Arlington Heights* was decided shows that it is not appropriate to use it to resolve Defendant's equal protection challenge.

Finally, it is acceptable that "Congress regularly makes rules that would be unacceptable if applied to citizens."  *Mathews*, 426 U.S. at 81-82.  In other words, Congress can push the boundaries further in laws directed to illegal aliens than it can push them in laws directed to citizens.  *Soskin v. Reinertson*, 353 F.3d 1242, 1254 (10th Cir. 2004) (citing *Mathews*, 426 U.S. at 78-83, for the principle that "Supreme Court precedent establish[es that] . . . the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis.").  When considering this principle

in combination with Congress's plenary power over immigration, it makes sense that the standard for evaluating equal protection challenges to Federal immigration statutes is more deferential than the standard that applies to equal protection challenges to laws relating to United States citizens.[4]

This brings us to *Carrillo-Lopez*, the case from Nevada on which Defendant relies and which is the only case of which the United States is aware has stricken down § 1326 based on *Arlington Heights*. Like Defendant, Mr. Carrillo-Lopez was charged with felony reentry in violation of 8 U.S.C. § 1326. *Carrillo-Lopez*, 2021 WL 3667330, at *1. And like Defendant has done, Mr. Carrillo-Lopez requested that the court dismiss the indictment on the theory that § 1326 violates the Equal Protection Clause under the standard articulated in *Arlington Heights*. *Carrillo-Lopez*, 2021 WL 3667330, at *1. Indeed, the arguments in the two cases are identical. The Nevada court agreed with the defendant that *Arlington Heights* applied and, in doing so, rejected the Government's arguments that rational basis scrutiny was the governing standard of review. *Carrillo-Lopez*, 2021 WL 3667330, at *2-*3. Based on the materials Mr. Carrillo-Lopez provided concerning the legislative history of immigration laws from the 1920s, as well as testimony and documents offered at a hearing that addressed the 1952 INA, the court ruled that § 1326 is unconstitutional. *Id*. at *4-*25. Defendant contends that this Court should follow the findings of fact made by *Carrillo-Lopez* concerning the 1952 INA, which are based on evidence that is not before this Court. Def. Mot. at 4-5, 25.

As to the Nevada court's decision to apply *Arlington Heights*, the fundamental flaw is that the court failed to mention either *Ledezma-Cosino*, 857 F.3d at 1049, or *Hernandez-Mancilla*, 633 F.3d at 1185, in which the appeals court whose law controls in the District of Nevada stated that rational basis review applies specifically to equal protection challenges of immigration laws. The Nevada court also gave short shrift to some of the Supreme Court precedents discussed above, namely: *Mandel*, 408 U.S. at 765, *Fiallo*, 430

---

[4]     States, by contrast, must provide a compelling reason to treat aliens differently from citizens. *E.g.*, *Graham v. Richardson*, 403 U.S. 365, 370-71 (1971).

U.S. at 792, and *Trump*, 138 S. Ct. at 2392.  *See Carrillo-Lopez*, 2021 WL 3667330, at *2.  Rather, the court relied upon cases that address far different circumstances than were before it to justify its decision to rely on *Arlington Heights*.  *Carrillo-Lopez*, 2021 WL 3667330 at *2-*3.

Two examples are illustrative.  Quoting *Wong Wing v. United States*, the Nevada court determined that the "Supreme Court has held that greater protections under the Fifth Amendment necessarily apply when the government seeks to 'punish[] by deprivation of liberty and property.'" *Carrillo-Lopez*, 2021 WL 3667330, at *2 (quoting 163 U.S. 228, 237 (1896)).  But *Wong Wing* resolved a claim by Chinese nationals that their imprisonment without a trial before a judge violated their due process rights, not an equal protection challenge to an immigration statute.  163 U.S. at 229.  The Nevada court also relied on *Regents of the University of California v. U.S. Department of Homeland Security*, 908 F.3d 476, 518-20 (9th Cir. 2018), which involved an equal protection challenge to the recission of the Deferred Action for Childhood Arrivals (DACA) program, and some of the parties to that suit were persons who had been allowed to remain legally in the United States while that program was in effect.  *Carrillo-Lopez*, 2021 WL 3667330, at *2.  The circumstances in *Wong Wing* and *Regents*, therefore, are very different than the circumstances in a case like this one, where an alien admittedly in the United States illegally seeks to challenge the constitutionality of the illegal reentry statute.

For these reasons, the Court should not apply *Arlington Heights*.  The Ninth Circuit has repeatedly stated that rational basis scrutiny applies.  Defendant's brief does not address this authority.  And in the only case Defendant cites that applied *Arlington Heights*, the court failed to recognize relevant controlling law.[5]  Rather, the Court should apply rational basis scrutiny and uphold § 1326 for the reasons stated in the next section.

---

[5]     The United States recognizes that one court in this District applied *Arlington Heights* in the context of a challenge to § 1325.  *United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, 2020 WL 7318124 at *1 (citing *Rios-Montano*, 2020 WL 7226441 at *1-*2).  However, for the reasons stated in this section, the United States respectfully disagrees with that case's conclusion.  *See also*, *Sanchez-Rodriguez*, No. 21-CR-2351-TWR, ECF No. 29 at 1 & n.1 (S.D. Cal. Sept. 20, 2021) ("find[ing] that the rational basis test applies" and finding it significant that out-of-district decisions to the contrary "failed to address the

### C.    Section 1326 Meets the Standard Of Rational Basis Scrutiny

When applying rational basis scrutiny, the Court must uphold a Federal law if it is "rationally related to a legitimate government purpose." *Hernandez-Mancilla*, 633 F.3d at 1185.  The statute is presumed constitutional, and the party challenging it has the burden "to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  And the Government has no obligation to produce evidence supporting the statutory classification. *Heller*, 509 U.S. at 320; *Aleman*, 217 F.3d at 1201.  Because Defendant's brief contains no analysis of the rational basis standard, if the Court agrees with the Government that this is the proper standard of review, it may deny Defendant's motion without conducting any further analysis. *Heller*, 509 U.S. at 320; *Aleman*, 217 F.3d at 1201.

In any event, § 1326 is rationally related to a legitimate government interest. Section 1326 "is designed to effectively enforce the immigration laws.  It is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." *Hernandez-Guerrero*, 147 F.3d at 1078 (citations and internal quotation marks omitted).  "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Id*.  Consequently, several district courts, including in this District, have upheld § 1326 after applying rational basis scrutiny. *E.g.*, *United States v. Navarrete-Castro*, No. 19-CR-2717-CAB (S.D. Cal. Nov. 19, 2020), ECF No. 70; *United States v. Rodriguez-Barios*, 20-CR-1684-LAB (S.D. Cal. Oct. 21, 2020), ECF No. 33; *Sanchez-Rodriguez*, No. 21-CR-2351-TWR (S.D. Cal. Sept.

---

standard of review mandated by *Hernandez-Mancilla*"); *Orozco-Orozco*, No. 21-CR-2349-TWR, ECF No. 21 at 1 & n.1 (S.D. Cal. Sept. 20, 2021)(same); *United States v. Lazcano-Neria*, No. 20-MJ-04538-AHG, 2020 WL 6363685, at *8 (S.D. Cal. Oct. 29, 2020) ("[T]he Court agrees with the Government that the rational basis test applies to any analysis of the constitutional validity of § 1325(a)(1) under the Equal Protection Clause."); *United States v. Lucas-Hernandez*, No. 19-MJ-24522-LL, 2020 WL 6161150, at *3 (S.D. Cal. Oct. 21, 2020) (same).

20, 2021), ECF No. 29; *Orozco-Orozco*, No. 21-CR-2349-TWR (S.D. Cal. Sept. 20, 2021), ECF No. 21; *United States v. Novondo-Ceballos*, No. 21-CR-383, 2021 WL 3570229, at *3-*5 (D. N.M. Aug. 12, 2021); *Palacios-Arias*, No. 3:20-CR-62-JAG, ECF No. 37.

## II.   **Defendant's Motion Must Still Be Denied Even If *Arlington Heights* Applies**

Defendant contends that § 1326 fails to satisfy the rubric set forth in *Arlington Heights*, and therefore, the Court must strike it down. 429 U.S. at 261-62, 265. According to Defendant, "Congress enacted illegal reentry with a discriminatory purpose" because "racism and eugenics" were a "motivating factor" in the criminalization of illegal reentry that occurred when Congress passed the 1929 UAA. Def. Mot. at 9. To support his argument, Defendant describes the following: some of the background of the passage of the 1929 UAA (*id*. at 9-11), some of the sequence of events leading up to its passage (*id*. at 11-12), portions of the legislative history of the 1929 UAA that contain provocative comments by a few lawmakers concerning race (*id*. at 12-18), departures from normal procedures or substantive conclusions that he perceives occurred during the passage of the 1929 UAA (*id*. at 18-20), and his belief that that the current § 1326 disparately impacts persons from Mexico and Latin America (*id.* at 20, 23-25). Defendant further contends that the "taint" of the 1929 UAA infects the current illegal reentry law he is charged with violating. Def. Mot. at 21-22.

Defendant's argument lacks merit. ***First***, the "challenged action" is the 1952 INA because it contains the law that was codified as 8 U.S.C. § 1326. Defendant has not identified any legislative history of the 1952 INA for the Court to consider; therefore, there is no basis to draw the inference that racial animus was a motivating factor in its passage. ***Second***, if the Court nonetheless were to consider the legislative history of the 1929 UAA, the additional context provided below casts serious doubt as to the veracity of Defendant's conclusion that racism and eugenics were a motivating factor in its passage. ***Third***, there is no disparate impact as the fact that more Mexican and Latinx

persons are prosecuted under § 1326 is purely a function of the fact that the United States shares a 1,954-mile land border with Mexico.

### A. Racial Animus Was Not A Motivating Factor For The Passage Of The "Challenged Action"—The 1952 INA

Step one in the *Arlington Heights* analysis is to identify the "challenged action." 429 U.S. at 261-62, 265. The parties dispute what that action is. Defendant contends that it is the 1929 UAA. He is wrong. The 1952 INA contains the law that was codified as § 1326, which is the statute Defendant is charged with violating and is the statute that would be stricken down were the Court to agree with Defendant. Further, there is no evidence before the Court that racial animus was a motivating factor in the passage of the 1952 INA.

### 1. Summary Of The Passage Of The 1952 INA

The Immigration Act of 1917 established that an alien who, within three years after entry, entered the United States at any time or place other than as designated by immigration officials, or who entered without inspection, shall be deported. Pub. L. No. 64-301, § 19, 39 Stat. 874, 889, Ch. 29. Deportation was the only penalty for reentry.

When it passed the 1929 UAA, the 70th Congress made reentry after deportation a felony offense punishable by up to two years in prison and up to a $1,000 fine. Pub. L. No. 70-1018, 45 Stat. 1551, Ch. 690. This was done to strengthen the deterrent effect of the immigration laws. S. Rep. No. 70-1456 at 1 (Jan. 17, 1929) (noting that there was no law providing any penalty other than deportation for unlawful reentry, explaining that this legislation would make illegal reentry a felony offense punishable by up to two years' imprisonment and a $1,000 fine, which "is believed . . . would be of material aid in enforcing our immigration laws"). The Secretary of the Department of Labor—who was charged at that time with enforcing the country's immigration laws—agreed. In a letter incorporated into the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws[,]" explaining that "no prohibitive law can successfully be enforced without a deterrent penalty," and

1    "[t]he fact that possible deportation is not a sufficient deterrent to discourage those who
2    seek to gain entry through other than regular channels is demonstrated by the frequency
3    with which this department is compelled to resort to deportation proceedings for the same
4    alien on several succeeding occasions." *Id.* at 2.

5    The 82nd Congress passed the 1952 INA.  Pub. L. 82-414, 66 Stat. 163, Ch. 477.
6    The 1952 INA "revise[d] the laws relating to immigration, naturalization, and nationality"
7    and expressly repealed the 1929 Act.  Pub. L. 82-414, Introduction, 66 Stat. 163,
8    § 403(a)(30), 66 Stat. 279.  The passage of the 1952 INA was "the final product of a most
9    intensive and searching investigation and study over a three-year period."  *Pena-*
10   *Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968), *abrogation on other*
11   *grounds recognized by United States v. Castillo-Mendez*, 868 F.3d 830, 835-36 (9th Cir.
12   2017); *see also, e.g.*, Oscar M. Trelles, II and James F. Bailey, III, 1 Immigration and
13   Nationality Acts:  Legislative Histories and Related Documents at iii (Introduction)
14   (1979).

15   In recommending that the House pass H.R. 5678, the bill that became the 1952
16   INA, the report of the House Judiciary Committee mentioned only the following with
17   respect to illegal reentry:

18   > As in existing law, both administrative fines and civil and
19   > criminal penalties are provided as an aid in the enforcement of
     > the provisions of the bill.
     >
     >                                   ***
     >
20   > [C]riminal sanctions are provided for entry of an alien at an
21   > improper time or place, for misrepresentation and concealment
     > of facts, for reentry of certain deported aliens, for aiding and
22   > assisting subversive aliens to enter the United States, and for
     > importation of aliens for immoral purposes.

23   H. Rep. 82-1365 at 67, 68.  This shows that the fundamental purpose of the penalties in
24   § 1326 was to assist the enforcement of immigration laws. *See Hernandez-Guerrero*, 147
25   F.3d at 1078.  And this is the same purpose expressed for the illegal-reentry penalties
26   adopted in the 1929 UAA.  *See* S. Rep. No. 70-1456 at 1-2 (Jan. 17, 1929).

27   The 1952 INA also removed all racial bars to immigration and naturalization. *See*
28   Pub. L. 82-414, §§ 201, 202, 311, 66 Stat. 163, 175-78; H. Rep. 82-1365 at 28.  Further,

as under the Immigration Act of 1924, *see* Pub. L. No. 68-139, § 4, 43 Stat. 153, 155, the 1952 INA provided that individuals born in the Republic of Mexico—as well as those born in Canada and several other countries—were not subject to immigration quotas. *See* Pub. L. 82-414, § 101, 66 Stat. 163, 169 ("The term 'nonquota immigrant' means— . . . an immigrant who was born in Canada, the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America, and the spouse or the child of any such immigrant, if accompanying or following to join him[.]").

Section 276 of the 1952 INA was codified at 8 U.S.C. § 1326 and established the following felony offense for reentry of a deported alien—also punishable by up to two years in prison and a $1,000 fine:

> Any alien who—
>
>> (1) has been arrested and deported or excluded and deported, and thereafter
>>
>> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,
>
> shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

Pub. L. 82-414, § 276, 66 Stat. 229, codified at 8 U.S.C. § 1326; *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (discussing history of immigration laws and the 1952 INA).

Congress has amended § 1326 several times since the 1952 INA was enacted, and lawmakers have increased its deterrent value with each amendment. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (100th Congress adding a subsection (b) to § 1326 and creating enhanced penalties for aliens with prior felony

14

convictions); Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 4978, 5059 (increasing the fine levels; amending the fine provision so that a defendant convicted shall be fined under 18 U.S.C.); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (amending and increasing penalties under subsection (b)); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 507(c), 438(b), 441 110 Stat. 1214, 1267-68, 1276, 1279 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 241(b), 244(d)(3)(J), 334, 110 Stat. 3009-606, -618, -635 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

### 2. The 1952 INA Is The Challenged Action

*Arlington Heights* requires proof of discriminatory intent as to "the challenged action." 429 U.S. at 261-62, 265. Logic dictates that the 1952 INA is the challenged action—Defendant is charged with violating § 1326, which was codified when the 1952 INA was passed, and § 1326 would be stricken down were the Court to agree with Defendant's analysis. Defendant, however, maintains that the 1929 UAA is the challenged action based on a theory that racial animus motivated the passage of the 1929 UAA and the taint of that animus was not cleansed when the 1952 INA was passed. Def. Mot. at 21-25. This is incorrect.

Generally, "the starting point in discerning congressional intent is the existing statutory text, not the predecessor statute." *Lamie v. U.S. Trustee*, 540 U.S. 526, 527 (2004) (internal citations omitted). Implicit in this statement is that Congressional intent may not carry over when a statute is amended or replaced. *See United States v. Price*, 361 U.S. 304, 332 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); Order at 7, *Palacios-Arias*, No. 3:20-CR-62-JAG, ECF No. 37 ("Just as 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,' the views of an *earlier* Congress 'form a

15

hazardous basis for inferring the intent of' a later one." (quoting *Price*, 361 U.S. at 313)). Several Circuits have declined to infer discriminatory intent from a previous enactment, instead choosing to focus on the law being challenged. *E.g.*, *Hayden v. Paterson*, 594 F.3d 150, 165-69 (2d Cir. 2010); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1223-24 (11th Cir. 2005) (en banc); *Cotton v. Fordice*, 157 F.3d 388, 392 (5th Cir. 1998).

Particularly relevant is the fact that when addressing the same challenge to § 1326 that Defendant brings here, insofar as we can tell, every district court decision that has addressed the matter (other than the legally flawed *Carrillo-Lopez* decision) has ignored the 1929 UAA. That has been the case in this District. *E.g.*, *Gallegos-Aparicio*, 2020 WL 7318124, at *4-*7 (rejecting defendant's challenge to § 1325; explaining that "*Arlington Heights* directs the Court to look at the motivation behind the official act being challenged" and "[t]he Court therefore must consider whether [defendant] has shown that Congress's *1990 enactment of Section 1325* was motivated at least in part by a discriminatory purpose"; and concluding that "the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for [defendant's] position") (emphasis added); *Rios-Montano*, 2020 WL 7226441 at *7-*14 (same); *Lucas-Hernandez*, 2020 WL 6161150 at *2 ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *Ruiz-Rivera*, 2020 WL 5230519, at *3 ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on the legislative history of the UAA, a law that was enacted decades before.").

That has been the case in other courts as well. The District of New Mexico recently stated that the circuit cases cited two paragraphs above "have rejected the notion that prior congressional intent remains operative until a future Congress makes an affirmative contrary showing." *Novondo-Ceballos*, 2021 WL 3570229, at *5 (citations omitted) (ruling that § 1326 survives rational basis review after rejecting the same *Arlington Heights* argument raised here). Similarly, the Eastern District of Virginia stated:

16

> That history [of the 1929 UAA], however, d[oes] little to explain why Congress passed the [INA], the law that replaced the Undesirable Aliens Act of 1929 and that the defendant allegedly violated.  To challenge the INA using *Arlington Heights*, the defendant must provide evidence that a discriminatory purpose motivated Congress to pass that law.  He has not done so here.

*Palacios-Arias*, 3:20-CR-62-JAG, ECF No. 37 at 5; *see also United States v. Gutierrez-Barba*, No. CR-19-01224-001, 2021 WL 2138801, at *3-*4 (D. Ariz. May 25, 2021) (declining to consider the legislative history of the 1929 UAA and rejecting challenge brought under *Arlington Heights*); Order at 5-6, *United States v. Medina*, No. CR 20-0057 (C.D. Cal. Jan. 5, 2021) ECF No. 33 (same).

Defendant nonetheless urges the Court to focus on the provocative portions of the legislative history of the 1929 UAA that he has quoted in his brief.  To support this request, he points to two Supreme Court cases that purportedly support his position: *Ramos v. Louisiana*, 140 S. Ct. 1390, 1392-1402, 1408 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2251-53, 2254-63 (2020).   According to Defendant, these cases "confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint."  Def. Mot. at 22.   In other words, Defendant contends that the taint of the lawmakers' racist comments made when passing the 1929 UAA was not cleansed when the 1952 INA was passed because those comments were not addressed by the 80th Congress.  *Id.*

Defendant, however, mischaracterizes these cases.  As an initial matter, neither cites *Arlington Heights*, which is not surprising given that neither resolved a challenge brought under an Equal Protection Clause.  *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring in part); *Espinoza*, 140 S. Ct. at 2263 n.5.  In *Ramos*, the Supreme Court held that the Sixth Amendment requires unanimous jury verdicts to convict in federal and state cases, and accordingly, it invalidated Louisiana and Oregon laws that allowed convictions by non-unanimous juries.  140 S. Ct. at 1392-1402, 1408.  The Court acknowledged the undisputed evidence that "race was a motivating factor in the adoption" of these states'

17

laws.  *Id.* at 1394.  But the Court performed a textual analysis of the Sixth Amendment and overruled an earlier Supreme Court decision that had permitted Oregon and Louisiana to convict by non-unanimous juries; the Court did not delve into or rely on legislators' motivations for enacting these laws.  *Id.* at 1395-1402.

In *Espinoza*, the Court concluded that applying a "no aid" provision in Montana's constitution to bar the use of state scholarships to attend religious schools violated the Free Exercise Clause of the First Amendment.  140 S. Ct. at 2251-53, 2254-63.  The majority did not rely on any "checkered tradition" underlying the no-aid provision—contrary to Defendant's contention on page 21 of his motion; instead, the majority relied on the fundamental point that the provision violated the First Amendment because it "plainly exclude[d] schools from government aid solely because of their religious status." *Espinoza*, 140 S. Ct. at 2255, 2259.

Simply put: these two Supreme Court decisions do not stand for what Defendant says they do.  It is not surprising, then, that cases in this District and others have disregarded these cases when resolving the same equal protection challenge Defendant brings here.  *E.g.*,  *Gallegos-Aparicio*, 2020 WL 7318124, at *4-*5; *Rios-Montano*, 2020 WL 7226441, at *4 (same); Order at 6 n.7, *Palacios-Arias*, No. 3:20-CR-62-JAG, ECF No. 37; *Lucas-Hernandez*, 2020 WL 6161150, at *2-*3; *Ruiz-Rivera*, 2020 WL 5230519, at *3; *Novondo-Ceballos*, 2021 WL 3670229, at *4-*5; *Gutierrez-Barba*, 2021 WL 2138801, at *4; Order at 4-5, *Medina*, No. 20-cr-0057, ECF No. 33 (C.D. Cal. Jan. 5, 2021).  Defendant fails to provide any basis for the Court to reach a different conclusion than the one reached in these decisions.

Moreover, in all of the cases bulleted above on page 6—the ones Defendant cited in which *Arlington Heights* was applied to strike down a law—the courts limited their review to the history of the statute or ruling being challenged.  That is to say: Defendant has not identified a case that applied *Arlington Heights* the same way he urges the Court to do here, which is to strike down a law based on its predecessor statute's legislative

1  history that may support an inference that the earlier law was passed in part due to

2  discriminatory intent.

3      In sum, the case law dictates that the Court must focus on the legislative history of

4  the law being challenged.  Thus, if the Court reaches Defendant's *Arlington Heights*

5  argument, it should conclude that the 1952 INA is the challenged action and should limit

6  its review to the legislative history of that statute.

### 3.   The Legislative History Of The 1952 INA Shows That There Were Legitimate Reasons for § 1326

9      The legislative history of the 1952 INA described above shows that racism was not

10  a motivating factor for its passage.  Rather, as explained above, Congress appears to have

11  been concerned with assisting in the enforcement of immigration laws.  In fact, as also

12  noted above, the INA ***removed*** racial bars to immigration and naturalization for persons

13  from Mexico and other parts of Latin America and their families.[6]

14      Defendant has not submitted to the Court any legislative history or other evidence

15  that pertains to the passage of the 1952 INA.  Rather, Defendant only speaks of the 1929

16  UAA and seems to indicate that the 1952 INA is just a mere reenactment, without

17  providing a historical analysis of the 1952 INA or its enactment.[7]  As shown in the

18  previous section, Defendant's argument that the racist comments that were made by some

19  lawmakers during the debate of the 1929 UAA "taints" the passage of the 1952 INA not

---

[6]     It is noteworthy that the 82nd Congress that passed the 1952 INA shared only 21 members (less than 4 percent) with the 70th Congress, which passed the 1929 UAA. *See* Order at 7 n.8, *Palacios-Arias*, No. 3:20-CR-62, ECF No. 37.  By 1952, the individuals Defendant cites in the context of the 1920s legislation were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or dead (Coleman Blease, James Davis, John Box, Harry Laughlin).

[7]     Defendant cites the evidentiary hearing in *Carrillo-Lopez* briefly referencing the connection between the 1929 UAA and "1952 re-codification." Def. Mot. At 4-5. But, whatever evidence was produced in that case concerning the 1952 INA has not been supplied to this Court. Defendant should not be permitted to submit those materials now because there is no reason why they could not have been included with his motion. *See Graf*, 610 F.3d at 1166; *Bazuaye*, 79 F.3d at 120. And this Court cannot take judicial notice of the Nevada court's findings of fact. *E.g., M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("[A] court may not take judicial notice of proceedings or records in another case so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it.").

19

only finds no support in the case law he cites, it is contradicted by other case law. Therefore, the legislative history of the 1929 UAA is not relevant to this case. Because Defendant has presented no evidence that racial animus appears in the legislative history of the 1952 INA, his *Arlington Heights* argument fails.

## B. It Is Not Clear That Racial Animus Motivated The Passage Of The 1929 UAA

Even were the Court to assume for the sake of argument that the legislative history relating to the 1929 UAA is relevant, the Court should be dubious about accepting Defendant's characterization of the motivation for its passage. This is because Defendant relies on the affronting opinions of fewer than ten of the 531 members of the 70th Congress to argue that racism was the "primary" factor motivating the passage of the 1929 UAA. In making this argument, however, Defendant eschews statements by some of those same lawmakers that show that when the 1920s laws were being debated, Congress had broader concerns about economic issues and was not simply motivated by animus toward Mexican and Latinx persons.

For example, Defendant states that Rep. Thomas Blanton "complained that Mexicans 'come into Texas by hordes[.]'" Def. Mot. at 17. (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)). Defendant's brief fails, however, to mention that a moment later, Rep. Blanton discussed the need to preserve jobs for America citizens, asserting that "They are taking away jobs from American citizens." 70 Cong. Rec. 3619 (1929). Defendant also cites Rep. Blanton as "urg[ing] the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there.'" Def. Mot. at 17 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)). Defendant omits the very next sentence, which again is tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

As a second example, Defendant writes that Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the

bridges with no intention of ever going back.'"  Def. Mot. at 17 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  The very next words in that quoted passage—which has a comma after "ever going back," not a period—are "coming across to get jobs of Americans[.]"  70 Cong. Rec. 3619 (1929); *see also id.* (stating that "it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.").

And as third and fourth examples, Defendant also selectively quotes Reps. Schafer and Box.  Defendant cites Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]"  Def. Mot. at 17 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)). The full original quote is: "These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm.  Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor." 70 Cong. Rec. 3619 (1929).  Defendant also notes several comments of Rep. Box.  But Rep. Box also commented during congressional debate about the issue of jobs for his constituents: "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now."  70 Cong. Rec. 3619 (1929).[8]

While the United States recognizes that the opinions quoted by Defendant were reprehensible, those opinions are the only part of the story that Defendant tells.  As outlined above, even a shallow dive into the legislative history of the immigration laws from the 1920s reveals a more complicated picture than Defendant has provided, and a

---

[8]     Defendant also cites a "radio speech" by Rep. Robert Green in January 1928, which was read into the record by another representative.  Def. Mot. at 14-15 (quoting Mot. Ex. F, 70 Cong. Rec. 2461 (1928)).  Even in light of his race-related comments, Rep. Green was not targeting Mexicans, but appears focused mainly on an overall strengthening of immigration law and resources.  70 Cong. Rec. 2461 (1928) (noting the "tremendous situation" facing immigration authorities, "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States," the "immigration department" employed only 2,700 people—"inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol," and the burden, threat, and "economic loss," as he saw it, to public institutions).

closer examination casts doubt on Defendant's assertion that the racial animus expressed by a handful of lawmakers constituted a "motivating factor" for the passage of the 1929 UAA (much less, as he states on page 6 of his motion, "the **primary** factor"). *Arlington Heights*, 429 U.S. at 265. On this point, *United States v. O'Brien* is instructive:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. ***It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.***

391 U.S. 367, 383-84 (1968) (emphasis added).

Further, Defendant's reliance on "the cat's paw" doctrine is misplaced. Def. Mot. at 8, 18. In *Hobbs*, which *Brnovich* overruled, the Ninth Circuit relied upon this doctrine to attribute discriminatory intent to legislators who had not expressed it.[9] *Hobbs*, 948 F.3d at 1041 ("The good-faith belief of these sincere legislators does not show a lack of discriminatory intent behind H.B. 2023. Rather, it shows that well-meaning legislators were used as 'cat's paws.'"). Likewise, Defendant invokes this doctrine to argue that "Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the 'inferiority' of the 'Mexican race' during legislative sessions in the five years leading up to the law's passage[,]" suggesting that those who sat silent agreed with their colleagues who voiced racist opinions. Def. Mot. at 18 (citing *Hobbs*, 948 F.3d at 1041). But the Supreme Court has stated that this theory "has no application to legislative bodies," *Brnovich*, 141 S. Ct. at 2350, which undercuts Defendant's assertion that racism was the primary factor for the passage of the 1929 UAA.

---

[9] "The doctrine is based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey." *Hobbs*, 948 F.3d at 1041.

In short, Defendant asks the Court to do what the Supreme Court has cautioned should not be done—strike down § 1326 based on the opinions of "fewer than a handful of Congressman" expressed during the debate on a law that is no longer in effect, and also to attribute those affronting opinions to the entire 72nd Congress. *Brnovich*, 141 S. Ct. at 2350; *O'Brien*, 391 U.S. at 383-84. For the reasons stated in this section, the Court should decline to do so.

## C.   Defendant Fails To Establish Discriminatory Impact

Finally, Defendant argues that § 1326 has a disparate impact and discriminatory intent based on the high percentage of Border Patrol arrests of Mexican or Latinx individuals and other claimed subset disparities. Def. Mot. at 22-24. Those numbers do not establish that § 1326 violates his equal protection rights.

For context, in Fiscal Year 2019, Border Patrol had 859,501 total encounters,[10] of which 851,508—99.1 percent—were on the southwest border of the United States.[11] In Fiscal Year 2020, Border Patrol had 405,036 total encounters,[12] and 400,651—98.9 percent—of those occurred on the southwest border.[13] In light of the data, it is unsurprising that a high percentage of apprehensions (and potentially prosecutions) are of Mexican or Latinx individuals.

Data such as this, however, does not show disparate impact or discriminatory intent sufficient to sustain an equal protection challenge. In *DHS v. Regents of the Univ. of Cal.*, for example, the Supreme Court considered and rejected the argument that the rescission

---

[10]   U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021: Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

[11]   U.S. Customs and Border Protection,  Southwest Border Migration FY 2019: U.S. Border Patrol Southwest Border Apprehensions FY 2019 (Nov. 14, 2019), https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

[12]   U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021: Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

[13]   U.S. Customs and Border Protection, Southwest Border Migration FY 2020: U.S. Border Patrol Southwest Border Apprehensions FY 2020 (Nov. 19, 2020), https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020.

1  of the DACA program disparately impacted Latinx people from Mexico (who were 78

2  percent of DACA recipients), concluding: "because Latinos make up a large share of the

3  unauthorized alien population, one would expect them to make up an outsized share of

4  recipients of any cross-cutting immigration relief program.  Were this fact sufficient to

5  state a claim, virtually any generally applicable immigration policy could be challenged

6  on equal protection grounds." 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (citation omitted).

7  But more importantly, in this District in *Gallegos-Aparicio* the court concluded that

8  defendant's "conten[tion] that Mexicans and other Latin Americans make up the vast

9  majority of individuals apprehended at the border" did not "show discriminatory motive,

10  given that the disparity is explainable on grounds other than race."  No. 19-CR-2637-

11  GPC, at *8 (citing *Arlington Heights*, 429 U.S. at 266); *accord Rios-Montano*, No. 19-

12  CR-2123-GPC, 2020 WL 7226441, at *14-*16 (reaching same conclusion); Order at 6

13  n.7, *Palacios-Arias*, No. 20-CR-62-JAG, ECF No. 37 (same); *Lucas-Hernandez*, 2020

14  WL 6161150, at *2-*3 (same); *Ruiz-Rivera*, 2020 WL 5230519, at *4 (same).

15  Defendant's brief does not address these common-sense conclusions concerning the

16  impact § 1326 has, and for this additional reason, Defendant fails to show that the statute

17  violates his equal protection rights under *Arlington Heights*.

18      Finally, because Defendant cannot, as a matter of law, establish his equal protection

19  claim even under *Arlington Heights*, the Court should not hold an evidentiary hearing on

20  his motion to dismiss.  Def. Mot. at 25-26 (requesting hearing); *United States v. Irwin*,

21  612 F.2d 1182, 1187 (9th Cir. 1980) (stating standard for when an evidentiary hearing

22  may be conducted on a motion to dismiss).

23  //

24  //

25  //

26  //

27  //

28  //

1

## <u>CONCLUSION</u>

2     For the foregoing reasons, Defendant's motion should be denied.

3

4     DATED:  March 22, 2022                 Respectfully submitted,

5                                      Randy S. Grossman

6                                      United States Attorney

7                                      */s/ Nicole Bredariol*

8                                      NICOLE BREDARIOL

9                                      */s/ Vivian Sapthavee*

10                                      VIVIAN SAPTHAVEE
                                     Assistant U.S. Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28