1  **GERLONI S. COTTON**
   California State Bar No. 310868
2  **SAMANTHA B. JAFFE**
   California State Bar No. 324731
3  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
4  San Diego, California 92101-5030
   Telephone: (619) 234-8467
5  Facsimile: (619) 687-2666
   Gerloni_Cotton@fd.org
6  Samantha_Jaffe@fd.org

7  Attorneys for Defendant
   RAMIREZ-ALEMAN
8

9                   UNITED STATES DISTRICT COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12 | UNITED STATES OF AMERICA, | CASE NO.: 21-CR-3403-BEN |
|---|---|
13 | Plaintiff, | Hon. Roger T. Benitez |
   |  | Date: April 4, 2022 |
14 | v. | Time: 2:00 p.m. |
15 | OSCAR RAMIREZ-ALEMAN, | **REPLY TO RESPONSE TO MOTION TO DISMISS THE INDICTMENT PURSUANT TO *ARLINGTON HEIGHTS*** |
16 | Defendant. | |
17

18  **I.   Introduction**

19  In response to Mr. Ramirez-Aleman's motion to dismiss, ECF No. 27, the

20  government argues, first, that this Court should apply rational basis scrutiny, not the

21  *Arlington Heights* framework, to a challenge to § 1326. It then argues that, even under

22  *Arlington Heights*, the challenge fails because the law that should be considered is the

23  1952 reenactment, not the original 1929 law, and because "only a portion" of the

24  legislative history is being considered. ECF No. 36 at 2. Finally, it argues that

25  discriminatory impact has not been shown. ECF No. 36 at 23. As stated in more

26  detail below, these arguments fail. *Arlington Heights* is the applicable framework for

27  analyzing a race-based equal protection challenge to a federal criminal statute. And the

28  1952 reenactment both cannot cure the taint of the original 1929 legislation, and is

infected, on its own, with race-based discrimination. As to the legislative history, extensive evidence as to the 1929 legislative history was previously presented,[1] and additional evidence as to the 1952 legislative history is presented here as Exhibit A. If this Court has questions, this Court should order an evidentiary hearing so that trained historians can testify as to the legislative history and the motivations of the legislators in enacting § 1326 in 1929, and in reenacting it in 1952. Finally, Mr. Ramirez-Aleman has shown disparate impact sufficient to sustain an equal protection challenge.

## II.  *Arlington Heights* **applies to § 1326.**

*Arlington Heights* is the correct standard for analyzing race-based equal protection claims. Further, § 1326 is not an "immigration law" as the government contends: it is a federal criminal law subject to greater constitutional and procedural scrutiny. And finally, even if § 1326 were an immigration law, not every immigration law receives rational basis review.

Mr. Ramirez-Aleman is making a race-based claim: the claim of discriminatory treatment is not based on immigration status. It is black-letter law that "[e]qual protection demands that racial classifications, especially suspect in criminal statutes, be subjected to the most rigid scrutiny." *Loving v. Virginia*, 388 U.S. 1 (1967) (internal citation and quotation marks omitted). "[T]he Supreme Court has repeatedly held that reliance 'on racial or ethnic criteria must necessarily receive a most searching examination to make sure it does not conflict with constitutional guarantees.'" *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 (9th Cir. 2000) (en banc) (quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 273 (1986)). Courts, therefore, apply the highest level of scrutiny to race-based claims to ensure that there is "little or no possibility" that the motive underlying the government action relied on an "illegitimate racial prejudice or stereotype." *Id.* This principle was reaffirmed by the

---

[1] The initial motion included an eight-page declaration by Dr. Kelly Lytle Hernandez, as well as 179 pages of legislative history. ECF No. 27-1, Exhibits A-L.

Supreme Court when it considered the Deferred Action for Childhood Arrivals ("DACA") program, and applied *Arlington Heights*. As this Court is aware, in *Department of Homeland Security v. Regents of the University of California*, in 2020, a majority of the Supreme Court declined to apply the highly deferential standard of review advocated for by the government in the context of an equal protection challenge to the repeal of DACA, and instead applied *Arlington Heights*. 140 S. Ct. 1891, 1915 (2020). The Ninth Circuit, in the opinion below, and five justices on the Supreme Court all applied *Arlington Heights*. *Id.* at 1915–16; 1917–18 (Sotomayor, J., dissenting). And in *Ramos v. Wolf* the Ninth Circuit applied *Arlington Heights*, rather than a more deferential standard of review, to the executive branch's repeal of immigration enforcement policies. 975 F.3d 872, 896 (9th Cir. 2020). *Regents* and *Ramos* confirm that this Court should apply *Arlington Heights* regardless of whether the challenged law relates to immigration. Immigration status cannot negate the elevated scrutiny that race-based claims demand.

Rational basis review is also inapplicable here because § 1326 is a federal criminal law, not an "immigration" law. Criminal defendants are all entitled to due process, pursuant to the Fifth Amendment, regardless of immigration status. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896). And the Supreme Court, in *United States v. Mendoza-Lopez*, unequivocally held that § 1326 has to comport with the constitutional requirement of due process. 481 U.S. 828, 837 (1987). "[T]he federal government's plenary power over immigration matters does not provide it license to enact racially discriminatory statutes in violation of the equal protection guarantee of the Fifth Amendment." *United States v. Rios-Montano*, Case No. 19-CR-2123-GPC, ECF No. 82 at 4 (S.D. Cal. Dec. 8, 2020). And in *Fiallo*, which the government relies on, ECF No. 36 at 4, 7, the Court actually distinguished between civil immigration laws and border-related crimes for purposes of the standard of review. 430 U.S. 787 at 793–94 (1977). *Fiallo* actually distinguished between the more robust constitutional protections afforded in criminal cases from the deference afforded to Congress' "power to

determine which classes of aliens may lawfully enter the country." *Id.* at 794. And the elevated level of scrutiny applied to criminal proceedings pre-dates *Fiallo* by nearly a century. *Wong Wing*, 163 U.S. at 234. Since *Wong Wing*, courts have always distinguished between the rights afforded people in criminal versus immigration proceedings. This challenge is about a federal criminal law, not an immigration law.

     Finally, even if this were an immigration law, not every immigration law or policy receives rational basis review, as *Regents* and *Ramos* make clear. "A challenged law does not receive minimal scrutiny merely because it is related to immigration." *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018). As noted above, the Ninth Circuit and five justices on the Supreme Court applied *Arlington Heights* in a challenge to the repeal of DACA. Regents, 140 S. Ct. 1891, 1915. And the Ninth Circuit applied *Arlington Heights* in a challenge to the termination of the Temporary Protected Status program. *Ramos*, 975 F.3d at 896. In *Ramos*, the Ninth Circuit distinguished *Trump v. Hawaii* and *Fiallo* (cases applying a lower standard of review) because those cases "turned primarily" on the executive branch's authority "to manage our nation's foreign policy and national security affairs without judicial interference." *Id.* at 895. The cases show that courts don't apply rational basis simply because a law relates to immigration. Rather, the cases show that courts apply rational basis in cases where noncitizens are applying for admission from abroad. Individuals charged with § 1326 are not applying for "admission" to the United States from abroad: they are ineligible to do so. And again, this motion concerns a federal criminal law passed by Congress, not an executive branch immigration policy, like *Regents* and *Ramos*, where the Ninth Circuit and Supreme Court still applied *Arlington Heights*. The executive branch is not subject to Constitutional equal protection limitations that Congress is free to ignore. *Arlington Heights* applies here.

*//*
*//*
*//*

### III. The 1952 reenactment could not and did not cure the 1929 law of its unconstitutional taint.

The government argues that, even if *Arlington Heights* applies, the "challenged action" is the 1952 INA, not the 1929 INA. ECF No. 36 at 11–19. But neither Ninth Circuit nor Supreme Court precedent allows a reenactment to cure discrimination from an earlier passage of a law.

The Supreme Court actually addressed this question in *Hunter v. Underwood*, 471 U.S. 222, 227 (1985). Delegates at the 1901 Alabama constitutional convention wrote a provision denying the right to vote to people convicted of certain crimes, specifically crimes that they believed were "more frequently committed by blacks." Id. Writing for a unanimous court, Justice Rehnquist held that that provision was unconstitutional under *Arlington Heights*, even though its defenders argued that subsequent edits to the list of crimes in the last 80 years had "legitimated the provision." *Id.* At 233. The Hunter Court held that these changes to the statute were irrelevant. *Id.* The Court noted that it was not deciding whether the provision "would be valid if enacted today without any impermissible motivation[,]" instead, the Court held that the original enactment "was motivated by a desire to discriminate against blacks[,]" "continues to this day to have that effect[,]" and thus "violate[d] equal protection under *Arlington Heights*." *Id.*

*Hunter* was reaffirmed in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). In Abbott, the Supreme Court refused to consider the legislature's racial motives behind a 2013 redistricting map that had been repealed and replaced with a court-approved version. *Id.* at 2325. Abbott declined to rely on Hunter because it was a "very different situation" where the discriminatory provision was "never repealed." *Id.* Though time had "pruned" the list of disqualifying offenses in *Hunter*, "the amendments *did not alter* the intent with which the article, including the parts that remained, had been adopted." *Id.* (emphasis added).

//

**IV.   No reenactment has meaningfully altered § 1326 or grappled with its racially-motivated origins.**

Congress has never meaningfully debated or confronted the history behind illegal reentry, nor has it ever consciously reenacted it for non-racial reasons. Congresses recodification of illegal reentry in the McCarran-Walter Act of 1952 contained no direct debate or discussion of the 1929 law – the Senate Report for the 1952 reenactment outlines the continuity between the two laws, recommending that the "the present act of March 4, 1029, should be reenacted" in the new version and its provisions "carried forward." THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES, S. REP. NO. 81-1515, 655, 656 (1950).

Congress's failure to confront the racially-discriminatory reasons for enacting § 1326 is not surprising given that the statute has undergone little change in the last century. *See Abbott*, 138 S. Ct. at 2316 (declining to consider the legislature's original motive because the provision had been "substantially changed" and "markedly altered"). The 1929 version of illegal reentry stated that if a noncitizen has been "arrested and deported in pursuance of law" and later "enters or attempts to enter the United States," they "shall be guilty of a felony" and be "punished by imprisonment for not more than two years." Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929). Similarly, the current version states that if a noncitizen has been "denied admission, excluded, deported, or removed" and later "enters, attempts to enter, or is at any time found in, the United States," they shall be "imprisoned not more than two years." 8 U.S.C. § 1326(a). These versions "bear substantially similar language" to one another. *United States v. Rizo-Rizo*, 16 F.4th 1292, 1298 (9th Cir. 2021). Aside from minor clarifications,[2] the statute criminalizes the same core conduct it did in 1929— returning to the U.S. after a prior deportation.

---

[2] The current version also includes reentries that occur when an order of removal is outstanding and exempts people who have either obtained, or need not seek, consent to reenter. *See* 8 U.S.C. § 1326(a). Though the 1952 Congress removed language requiring that the noncitizen be "deported in pursuance of law," the Supreme Court then held that a deportation must "comport with the constitutional requirement of due process." *United States*

For instance, Congress never criminalized (in § 1326 or elsewhere) entering the U.S. on a visa and staying beyond the permitted time period. 1-ER-10. Yet visa overstays now outnumber border crossers two-to-one as a percentage of the newly-undocumented population.[3] Even after the attacks of 9/11—perpetrated by individuals who came legally on visas and overstayed[4]—Congress never updated the statute to criminalize conduct that poses a *greater* threat to national security than unlawfully crossing the border.[5] This legislative inertia suggests that Congress has never meaningfully considered the intent behind § 1326, nor adopted it for non-discriminatory reasons.

Constitutional scholars agree that a discriminatory taint continues to infect § 1326. As one explained, the "operative core" of the law has been "carried forward functionally unchanged." W. Kerrel Murray, Discriminatory Taint, 135 Harv. L. Rev. 1192, 1252, 1253 (2022). "Congress's reenactments have neither specifically referenced the 1929 law nor engaged with the risks of perpetuating a plausibly discriminatory past." *Id.* at 1252–53. What's more, "no intervening event" has "cut[] the continuity chain," and "the mere passage of time is insufficient, as is the mere presence of intervening reenactment." *Id.* at 1252.

---

*v. Mendoza-Lopez*, 481 U.S. 828, 835, 837 (1987).

[3] Richard Gonzales, For 7th Consecutive Year, Visa Overstays Exceeded Illegal Border Crossings, NPR (Jan. 16, 2019, 7:02 PM), https://www.npr.org/2019/01/16/686056668/for-seventh-consecutive-year-visa-overstays-exceeded-illegal-border-crossings.

[4] *See* "From the 9/11 Hijackers to Amine El-Khalifi: Terrorists and the Visa Overstay Problem," Before the Subcomm. On Border and Maritime Security of the H. Comm. on Homeland Sec., 112th Cong. 1 (2012) (noting that several of the 9/11 hijackers overstayed their visas and that "[e]ntering a country and overstaying a visa has been the preferred method for terrorists actually to enter our country"), https://www.govinfo.gov/content/pkg/CHRG-112hhrg76600/html/CHRG-112hhrg76600.htm.

[5] *See* "Visa Overstay Tracking: Progress, Prospects and Pitfalls," Before the Comm. On Homeland Sec., 111th Cong. 1 (2010) https://www.cfr.org/sites/default/files/pdf/2010/03/AldenTestimony3.25.2010.pdf.

And the Ninth Circuit has relied on the legislative history surrounding the original version of illegal reentry to determine congressional intent. In *Rizo-Rizo*, the Court pointed to the "legislative history" of § 1326's "precursor statute" to interpret the lesser-included offense of misdemeanor § 1325—despite its later reenactment. 16 F.4th at 1298. And in *United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019), the Court discussed the origins of the lesser included offense of § 1325 and Congress's "minimal alteration" of the statute in 1952. Had this reenactment rendered the history surrounding the 1929 version of the statute irrelevant, it would have made no sense for the Court to consider it in these cases.

## V.   Discriminatory intent also motivated the reenacted version of illegal reentry.

The 1952 Congress, as a factual matter, did not simply fail to repudiate racial animus. They chose to recodify and make harsher illegal reentry at the same time as they expanded grounds for deportation and limited discretionary relief from deportation. They did so over a presidential veto. And the same Congress also passed, a few months earlier, a discrete piece of alien harboring legislation known as the "Wetback Bill" that exempted employers from prosecution. Exempting employers, who incentivize illegal immigration and are vastly more responsive to deterrence than impoverished and uneducated Mexican workers, in the same proverbial breath as reenacting illegal reentry, and with full knowledge of the disparate impact of illegal reentry on Mexican migrants, is among the many factors demonstrating racial animus was a motivating factor for the 1952 Congress.

In *Carrillo-Lopez*, following a day-long evidentiary hearing, the district court explicitly ordered post-hearing briefing on the question of "whether the racial animus motivating the Act of 1929 tainted the statute's reenactment in 1952[.]" *United States v. Carillo-Lopez*, 2021 WL 3667330, *9, n.18 (D. Nev. Aug. 18, 2021). The district court then concluded that race remained a "motivating factor" in the 1952 reenactment. *Id.* at *10 –18. The district court relied on a historian's testimony regarding Congress's

8                                    21-CR-3403-BEN
REPLY TO RESPONSE TO MOTION TO DISMISS THE INDICTMENT

willingness to remain silent, and how that silence was particularly telling given that President Truman vetoed the Immigration and Nationality Act on the basis that it "'continue[d], practically without change' discriminatory practices first enacted in 1924 and 1929." *Id.* at *12 (quoting Truman's veto statement).

Furthermore, Deputy Attorney General Peyton Ford wrote a letter to Congress in support of the law that used the "racially derogatory term 'wetback'" and proposed expanding the law to include people "found in" the U.S. *Id.* at *13. Not only did this reflect "the racial environment and rhetoric in 1952 … specifically with regard to Mexican . . . people," it was also "the only recommendation adopted by Congress" and "the only substantive change" to § 1326. *Id.* Indeed, "the same Congress during the same time frame" passed a law known as the "Wetback Bill," which was "aimed strictly at Mexicans" and debated with frequent use of that racial slur. *Id.* at *14.

In the Eastern District of Washington, Judge Peterson held an evidentiary hearing that was focused, for large parts, on this exact question. A historian, S. Deborah Kang, an Associate Professor in the Department of History at the University of Virginia, testified about the legislative history of the 1952 reenactment and the more modern amendments. Exhibit A, Transcript, *United States v. Munoz-De La O*, 2:20-CR0134-RMP. With regard to the 1952 reenactment, Dr. Kang testified that the McCarren-Walter Act was passed on the landscape of the forced repatriation drives of the 1930s and the Bracero Program that began in 1942. Exh. A at 25–33. She testified about hearings on the Senate floor between senators and INS where it is clear that what the bill was intended to do was continue the compromise, which began in 1929, between southwestern agribusiness, who wanted cheap and exploitable labor from Mexico, and nativists, who wanted to expel those of Mexican descent. Exh. A at 32–33, 38–40. She testified that, in her opinion, "Congress would not have recodified 1326 were it not for racial animus." Exh. A at 45. She testified that her opinion was based on "the pervasive racial animus of the times, [and] the racial animus that was expressed during the debates over the act." Exh. A at 45. In short: the 1929 and 1952

Acts are the same Act, and the reenactment cannot cure the discrimination that motivated the passage of the 1929 law. But even if it could, the 1952 law is also infected with the same discrimination.

### VI. Disparate impact need not reflect discrimination from modern-day law enforcement.

To show disparate impact, Mr. Ramirez-Aleman does not need to show that the law is being applied unfairly. Disparate impact requires a party to show only that a law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). This analysis is purely mathematical and does not require the disparity to be motivated by *current* discrimination against the targeted group. *See Hunter*, 471 U.S. at 233 (requiring only that the "*original* enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect") (emphasis added).

The Supreme Court's recent DACA decision does not hold to the contrary. In *Regents*, 140 S. Ct. at 1915, a plurality noted that one source of "[p]ossible evidence" of a discriminatory intent was a provision's "disparate impact on a particular group[.]" To show that a discriminatory intent motivated DACA's rescission, the respondents cited the "disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients[.]" *Id.* While *Regents* held that this fact was not "sufficient" to prove a discriminatory intent in that case, it did not hold that it was irrelevant. *Id.* at 1915–16.

Here, the U.S. Sentencing Commission reports that over 99% of the people convicted of illegal reentry in 2020 were Hispanic.[6] This statistic is 22% higher than the percentage of Hispanics in the undocumented population as a whole,[7] an

---

[6] United States Sentencing Commission, Quick Facts Illegal Reentry Offenses, Research and Publications (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

[7] *Profile of the Unauthorized Population: United States,* Migration Policy Institute (2019), https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

overrepresentation suggesting that § 1326 reaches a disproportionately high number of people from the racial group it was created to harm. The attached chart is based upon the northern border only, and shows that there is, in fact, a disparity in prosecutions based on race. In other words, the fact that Mexico borders the U.S. does not erase the disparate impact of illegal reentry—it shows that the law is working precisely as the 1929, and 1952, legislators intended. Thus, contrary to the district court's belief, evidence of disparate impact need not be motivated by animus to be relevant to a finding of discriminatory intent.

### VII. Conclusion

In sum: *Arlington Heights* applies to federal criminal laws enacted with discriminatory intent, and the government has failed to meet its burden to show that § 1326 would have been enacted absent a discriminatory purpose. Reenactments do not cure the taint of the impermissible discriminatory intent, and even if they could, the 1952 one does not. And Mr. Ramirez-Aleman has shown that § 1326 has a disparate impact on individuals of Hispanic descent. At minimum, if this Court has questions, this Court should order an evidentiary hearing to hear from trained and qualified expert historians as to the legislative history.

| | Respectfully submitted, |
|---|---|
| Dated: March 28, 2022 | *s/ Gerloni S. Cotton* |
| | Federal Defenders of San Diego, Inc.<br>Attorneys for Oscar Ramirez-Aleman<br>Email: Gerloni_Cotton@fd.org |
| Dated: March 28, 2022 | *s/ Samantha B. Jaffe* |
| | Federal Defenders of San Diego, Inc.<br>Attorneys for Oscar Ramirez-Aleman<br>Email: Samantha_Jaffe@fd.org |