1
2
3
4
5
6
7
8
9       UNITED STATES DISTRICT COURT
10      SOUTHERN DISTRICT OF CALIFORNIA
11

12   UNITED STATES OF AMERICA,                  Case No.:  21cr3403-BEN
13                          Plaintiff,
14   v.                                         **ORDER DENYING DEFENDANT'S**
                                                **MOTION TO DISMISS THE**
15   OSCAR RAMIREZ-ALEMAN,                       **INDICTMENT**
16                          Defendant.
17

18          It is alleged in a superseding indictment that Oscar Ramirez-Aleman was removed

19   from the United States after March 26, 2018, and subsequently on November 25, 2021,

20   attempted to re-enter the United States without permission by boarding a panga boat

21   destined for the United States.  Now once again, he is charged with violating 8 U.S.C.

22   §1326(a) and (b).  He moves to dismiss the charge by arguing that §1326 was racist at its

23   inception.  Because § 1326 is tainted with racism, he argues it violates his constitutional

24   right to equal protection implied in the Due Process Clause of the Fifth Amendment.  He

25   relies on a real estate zoning case to support his argument.  *See Village of Arlington*

26   *Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  It has not

27   been the most successful argument.

28

## I.    Background

Ramirez-Aleman is an alien.  In 2012, he violated federal drug laws by carrying approximately twenty-one kilograms of marijuana from Mexico into the United States with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).[1]  Ramirez-Aleman was thereafter deported or removed from the United States.  In 2018, Ramirez-Aleman was found in the United States without permission and charged with violating 8 U.S.C. §1326(a) and (b).  He pleaded guilty and was convicted.[2]  During the sentencing hearing Defendant promised: "I want to say that I regret doing this, and I will never do it again."[3]

## II.    The Statute

In relevant part, the statute which Ramirez-Aleman is alleged to have violated, § 1326(a) and (b), provides: "[A]ny alien who (1) has been denied admission, excluded, deported, or removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States," without permission from the Attorney General, "shall be fined under title 18, or imprisoned not more than 2 years, or both."  8 U.S.C. § 1326(a). Under § 1326(b)(1), an alien whose removal was subsequent to a felony conviction faces a possible sentence of 10 years.  Under § 1326(b)(2), an alien who has been previously convicted of an aggravated felony faces a possible sentence of 20 years.  In this way, the statute penalizes returning aliens who have previously been removed and advised that they may not enter, attempt to enter, or be found in the United States without permission. The statute affords harsher penalties for aliens who commit felonies while in the United

---

[1] *See United States v. Ramirez-Aleman*, Case No. CR 11-03944-018-TUC-JGZ (JJM) (D. Ariz.), Plea Agreement (dated Dec. 23, 2011) and Judgment (dated Mar. 5, 2012).
[2] *See United States v. Ramirez-Aleman*, Case No. 18cr0532-H (S.D. Cal.), Plea Agreement (dated Mar. 8, 2018) and Judgment (dated Mar. 26, 2018).
[3] *See United States v. Ramirez-Aleman*, Case No. 18cr0532-H (S.D. Cal.), Transcript of Sentence (dated Mar. 26, 2018), at 9:23-24.

2

21cr3403-BEN

States and the harshest penalties for aliens who commit aggravated felonies while in the United States.

While a similar provision was first enacted in 1929, the illegal reentry provision of 8 U.S.C. §1326 was enacted by the 82nd Congress in 1952.  It has been amended multiple times.  *See* Immigration and Nationality Act of 1965, Pub. L. No. 89-236, Oct. 3, 1965, 79 Stat. 911-922; Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181; Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

### III.   Existing Caselaw

Defendant moves to dismiss his prosecution on the grounds that § 1326 was enacted with Congressional racial animus and laws enacted with racial animus continue to be tainted with racial animus and violate the notion of equal protection when judged under the *Arlington Heights* standard.  It is not a new argument.  At least one circuit court and twenty district courts have considered and rejected the argument.  Among the appellate courts, the Sixth Circuit Court of Appeals has addressed the question and rejected the argument that § 1326 runs afoul of the equal protection doctrine.  *See United States v. Monreal-Hernandez*, 2022 US App LEXIS 4141 (6th Cir. Feb. 15, 2022) ("The possibly discriminatory intent of Congress in enacting § 1326 is not plain under current law . . . the Supreme Court did not mention the issue . . . [a]nd the district courts that have addressed the issue have concluded in unpublished decisions that the statute is constitutional.").  The argument is currently the subject of three cases pending before the Ninth Circuit and one case before the Tenth Circuit.  *See infra*.

### A.  Southern District of California

All of the decisions within this District reject the argument.  *See United States v. Ponce-Galvan,* No. 21cr2227-H, 2022 U.S. Dist. LEXIS 28379, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022); *United States v. De Jesus Bernal-Cota*, No. 21cr2274-TWR, 2021 U.S. Dist. LEXIS 232354 (S.D. Cal. Dec. 3, 2021); *United States v. Orozco-Orozco*, No. 21cr2349-TWR, 2021 U.S. Dist. LEXIS 178951 (S.D. Cal. Sept. 20, 2021); *United States v. Sanchez-Rodriguez*, No. 21cr2351-TWR (S.D. Cal. Sept. 20, 2021); *United States v. Gallegos-Aparicio*, No. 19cr2637-GPC (S.D. Cal. Dec. 11, 2020); *United States v. Rios-Montano*, No. 19cr2123-GPC, 2020 U.S. Dist. LEXIS 230122, 2020 WL 7226441 (S.D. Cal. Dec. 7, 2020); *United States v. Navarrete-Castro*, No. 19cr2717 (S.D. Cal. Nov. 19, 2020); *United States v. Rodrigues-Barios*, No. 20cr1684-LAB (S.D. Cal. Oct. 21, 2020), *appeal pending*, No. 21-50145; *United States v. Morales-Roblero*, No. 19mj24442-AHG (S.D. Cal. Sept. 14, 2020); *United States v. Lucas-Hernandez*, No. 19mj24522-LL (S.D. Cal. Oct. 21, 2020), *appeal pending*.

### B.  Courts Beyond the Southern District, Within the Ninth Circuit

Most other courts within the Ninth Circuit also reject the argument.  *See United States v. Munoz-De La O*, No. 20cr134-RMP, 2022 U.S. Dist. LEXIS 29868, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022); *United States v. Zepeda*, No. CR 20-57 FMO, 2021 U.S. Dist. LEXIS 209853, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021); *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Ore. 2021), *appeal pending*, No. 22-30023; *United States v. Gutierrez-Barba*, No. CR-19-1224-001-PHX-DJH, 2021 U.S. Dist. LEXIS 99844, 2021 WL 2138801 (D. Ariz. May 25, 2021), *appeal stayed*, No. 21-10232.

### C.  Courts Beyond the Ninth Circuit

And courts beyond the Ninth Circuit likewise reject the argument.  *See United States v. Hernandez-Lopez*, No. H-21-440, 2022 U.S. Dist. LEXIS 18649, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sanchez-Felix*, No. 21cr310-PAB, 2021 U.S. Dist. LEXIS 246343, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United*

*States v. Rivera-Sereno*, No. 2:21cr129, 2021 U.S. Dist. LEXIS 229579, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187, 2021 U.S. Dist. LEXIS 220954, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021), *appeal pending*, No. 22-6036; *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 U.S. Dist. LEXIS 214071, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Suquilanda*, No. 21cr63 (VM), 2021 U.S. Dist. LEXIS 202398, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Novondo-Ceballos*, No. 21cr383 RB, 2021 U.S. Dist. LEXIS 151779, 2021 WL 3570229 (D. N.M. Aug. 12, 2021); *United States v. Wence*, No. 3:20cr27, 2021 U.S. Dist. LEXIS 112805, 2021 WL 2463567 (D. V.I. June 16, 2021); *United States v. Palacios-Arias*, No. 3:20cr62-JAG (E.D. Va. Oct. 13, 2020).

Only one court has found the argument persuasive. S*ee United States v. Carrillo-Lopez*, No. 3:20cr26-MMD-WGC, 2021 U.S. Dist. LEXIS 155741, 2021 WL 3667330 (D. Nev. Aug. 18, 2021), *appeal pending*, No. 21-10233.

## IV. Constitutional Tests

### A. Rational Basis Test

To evaluate Defendant's equal protection claim, the first step is choosing the correct standard of review. Defendant argues for the *Arlington Heights* approach. The Government argues for rational basis review. Courts are split with no clear direction. The Ninth Circuit has said that it applies rational basis review for immigration statutes (although there have been recent exceptions). In *Ledezma-Cosino v. Sessions*, the Ninth Circuit said, "we have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context. Our sister circuits agree. Because Petitioner's equal protection fails under the ordinary rational basis test, this case provides no reason to question that longstanding approach." 857 F.3d 1042, 1049 (9th Cir. 2017) (*en banc*) (citations omitted). Six years earlier, in *Hernandez-Mancilla v. Holder*, the Ninth Circuit similarly instructed, "[w]e review equal protection challenges to federal immigration laws under the rational basis standard and uphold them if they are 'rationally

related to a legitimate government purpose.' 'Using such rational-basis review, a statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" 633 F.3d 1182, 1185 (9th Cir. 2011) (citation omitted).  Six years before that, in *Masnauskas v. Gonzales*, the Ninth Circuit explained, "[w]hen challenged under equal protection, 'line-drawing' decisions made by Congress . . . in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose." 432 F.3d 1067, 1071 (9th Cir. 2005).

In *United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), the Ninth Circuit addressed congressional power to pass criminal statutes regulating immigration. The defendant had challenged congressional authority to enact the same statute challenged today: 8 U.S.C. § 1326.  *Hernandez-Guerrero* held that "Congress possessed ample authority to enact § 1326 pursuant to its inherent immigration power."  147 F.3d at 1078.  The Ninth Circuit explained that the clear purpose of § 1326 "is to deter aliens who have been forced to leave the United States from reentering the United States." *Id*. According to *Hernandez-Guerrero,* Congress had plenary authority to enact § 1326, noting that by "threatening with criminal prosecution any alien found in the United States who has previously been 'excluded, deported, or removed,' Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." *Id*.

If rational basis is the test, § 1326 is clearly rational and passes the test.  Some have said that the correct test is even less demanding than the rational basis test.  "I would overrule our precedent and hold that the government's burden is even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, Bea,

21cr3403-BEN

and Ikuta, concurring)[4].  The deference owed by the courts to the other two branches on matters of immigration policy was underscored more recently in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).  "For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id*. at 2418 (citing *Fiallo v. Bell*, 430 U. S. 787, 792 (1977)).  *Trump* pointed out that even where an immigration statute did discriminate on the basis of sex, the Court concluded that even then, "'it is not the judicial role in cases of this sort to probe and test the justifications' of immigration policies." *Id*. at 2419.  Instead, notes the Court, "our opinions have reaffirmed and applied its deferential standard of review across different contexts and constitutional claims."  Very recently the Court again applied rational basis review to an equal protection claim.  In *United States v. Vaello-Madero*, the plaintiff argued that Congress's exclusion of residents of Puerto Rico from the Supplemental Security Income program violated the equal-protection component of the Fifth Amendment's Due Process Clause.  *United States v. Vaello-Madero*, No. 20-303, _ S. Ct. _, 2022 U.S. LEXIS 2094 (Apr. 21, 2022).  The Court held, "[i]n our view . . . Congress may distinguish the Territories from the States in tax and benefits programs such as Supplemental Security Income, so long as Congress has a rational basis for doing so." *Id*. at *8.

---

[4] "For well over a century, the [Supreme] Court has sharply curtailed review of laws governing the admission or exclusion of aliens under the plenary power doctrine.  The [Supreme] Court has said that 'over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.'  This is because the power to exclude or expel is 'an inherent and inalienable right of every sovereign and independent nation.'  Such power is inherent because the very idea of nationhood requires the drawing of thorny lines — between members and non-members, between admitted and excluded.  Our Constitution is the organizing document of a well-defined polity, not an international Golden Rule." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, Bea, and Ikuta, concurring) (citations omitted).

To sum up, the Ninth Circuit has instructed that equal protection challenges to immigration laws are to be reviewed using the rational basis test.  This is consistent with *Trump* and *Madero*.  Moreover, the Ninth Circuit has particularly held § 1326 to be a rational exercise of Congress' plenary power over immigration matters.  There is no analytical room left to go behind the statute and investigate the personal motives of individual legislators held one-half a century ago, much less as far back as 1929.

Defendant points out that neither the Ninth Circuit nor the Supreme Court has been so deferential in other recent cases.  To this end, Defendant cites *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020) to show that the Court applied *Arlington Heights* for an equal protection claim involving the DACA program.  It is correct to say that the Court applied *Arlington Heights* in that particular immigration context, although ultimately holding that the plaintiffs did not make out a plausible equal protection claim.  *Id.*  But the plaintiffs did not directly challenge an immigration statute.  Instead, the plaintiffs challenged agency procedure under the Administrative Procedure Act (APA).  In fact, the Court explained, "[w]e do not decide whether DACA or its rescission are sound policies.  The wisdom of those decisions "is none of our concern."  We address only whether the agency complied with the procedural requirement of the APA that it provide a reasoned explanation for its action."  *Id.* (citations omitted).

Defendant also points out, after *Ledezma-Cosino*, that a Ninth Circuit panel eschewed *Trump* and applied *Arlington Heights* to an equal protection challenge involving the alien Temporary Protected Status program.  *See Ramos v. Wolfe*, 975 F. 3d 872, 896 (9th Cir. 2020) ("Given the similarities between the EPC claim in this case and *Regents,* we reject the Government's contention that *Trump v. Hawaii's* standard of review should apply in this case.  We therefore review Plaintiffs' likelihood of success on their EPC claim under the *Arlington Heights* standard.).  Here again, however, the plaintiffs did not challenge the constitutionality of an immigration statute directly, but agency action under the APA.  In other words, in both *Regents* and *Ramos* the courts

21cr3403-BEN

were reviewing APA challenges involving equal protection rather than direct challenges to the constitutionality of an immigration statute.

In the end it does not matter. "[B]inding authority is very powerful medicine." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). One panel of the court of appeals cannot overrule a decision of the *en banc* court and the *Ramos* panel does not distinguish or mention the *Ledezma-Cosino en banc* decision. Moreover a district court may not disregard binding authority even if it would decide the issue differently. *Id*. at 1175 ("A district court bound by circuit authority . . . has no choice but to follow it, even if convinced that such authority was wrongly decided."). Therefore, in evaluating Defendant's equal protection defense to the charge of violating §1326, this Court must apply the rational basis test and it finds §1326 passes the test.

The text of § 1326 is race neutral. It makes no mention of race. It applies to aliens of any race. It does not distinguish between aliens. All previously deported aliens who enter, attempt to enter, or are found in the United States without permission are treated equally by the terms of the statute. *Hernandez-Guerrero* has already explained the rationale for §1326, noting that by threatening criminal prosecution Congress sought to give teeth to immigration statutes and to ensure compliance with deportation orders. 147 F.3d at 1078. Moreover, the harsher penalties apply only to returning aliens who have committed crimes within the United States, regardless of their race. This mechanism fosters public safety by discouraging proven criminals from entering the United States and incarcerating if they do enter, attempt to enter, or are found in the United States. The enhanced penalties for prior criminal convictions is entirely race-neutral on its face. Whether an alien in the country without permission commits another crime is entirely within the control of the individual, regardless of race. There is a rational basis for § 1326. Consequently, the application of § 1326 does not violate the notion of equal protection, as Defendant asserts in his motion to dismiss.

21cr3403-BEN

## B.  Intermediate Scrutiny Test

Even if something more than rational basis were required such as "intermediate scrutiny," sometimes applied by our courts, is used, § 1326 passes muster.  To satisfy intermediate scrutiny, the government's statutory objective must be "significant, substantial, or important," and there must be a "reasonable fit" between the challenged law and that objective.  *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020).   The statute need not employ the least restrictive means to pass intermediate scrutiny.  "Instead, the statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019) (brackets and internal quotation marks omitted).  In *Torres*, the court found 18 U.S.C. § 922(g)(5), a criminal statute, passed constitutional scrutiny because the burden was not severe on an illegally present alien's Second Amendment rights.  Here, as in *Torres*, the government's interest is in public safety and crime control.  "These government interests are particularly applicable to those subject to removal.  'Those who show a willingness to defy our law are a group that ought not be armed when authorities seek them.'"  *Id.* at 1264.  The government has "a strong interest in preventing people who already have disrespected the law (including . . . aliens unlawfully in the country, [and] felons, § 922(g)(1) . . .) from possessing guns."  *Id.*  "These restrictions . . . disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship."  *Id.* (citation omitted).  *Torres* concluded, "the government's interests in controlling crime and ensuring public safety are promoted by keeping firearms out of the hands of unlawful aliens -- who are subject to removal, are difficult to monitor due to an inherent incentive to falsify information and evade law enforcement and have already shown they are unable or unwilling to conform their conduct to the laws of this country.  These important government interests 'would be achieved less effectively' were it not for § 922(g)(5)."  *Id*.  In the same way, the government's interests in controlling crime and ensuring public

21cr3403-BEN

safety are promoted by criminalizing the entry, attempted entry, or being found in the United States by previously removed or deported aliens, and the interests would be achieved less effectively were it not for the criminal penalties of § 1326(a) and (b). Moreover, like the defendant in *Torres*, the Defendant in this case "may remove himself from the prohibition by acquiring lawful immigration status," or by obtaining permission from the Attorney General or his designee prior to re-entering the United States.

### C. *Arlington Heights* Test

Alternatively, even if *Arlington Heights* is applied, § 1326 survives the equal protection challenge. To begin, the Supreme Court has repeatedly held that a statute that relies on racial criteria receives a most searching examination to make sure that it does not conflict with constitutional guarantees. *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 (9th Cir. 2000) (citations omitted). "Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Id*. (citation omitted).

To make out a case of unequal protection, "a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Regents of the Univ. of Cal*., 140 S. Ct. at 1915 (quoting *Arlington Heights*, 429 U.S. at 266). Possible evidence includes proof of a disparate impact on a particular group, abnormal procedural sequences, and statements by members of the lawmaking body. *Id*. Defendant here focuses on the first and third categories of evidence: statements made by members of Congress and an alleged disparate impact on Hispanics. He does not flag any evidence in the second category of abnormal procedural sequences.

### 1. Statements by Lawmakers

In particular, Defendant claims § 1326's predecessor, a 1929 law, was the result of racial animus. To do so, Defendant relies on expert opinion from a professor of history,

21cr3403-BEN

Dr. Kelly L. Hernandez, who cites the public statements of a handful of congressmen at the time.  Defendant then points to the expert opinion of another history professor, Dr. Shulamith D. Kang, who opines that the 1952 re-enactment and all subsequent amendments have been the product of the same racial animus towards Hispanics.  Upon this evidence, Defendant argues that the racial animus infecting the 1929 statute continues to taint all of the reenactments and amendments.  Of course, attempting to identify Congressional motives for enacting a statute is hazardous work.  "Inquiries into congressional motives or purposes are a hazardous matter . . . when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.  What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."  *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Many courts have considered the legislative history of § 1326 and found the evidence of racial animus lacking.  For example, in the recent case of *Munoz-De La O*, the court described in detail the history of § 1326 and its amendments.  The court examined the same expert testimony by Dr. Kang as submitted in this case.  The court considered the same arguments made in this case about the legislative history.  The court concluded that the Defendant failed to meet the burden of demonstrating § 1326 was passed with an invidious discriminatory motivation.  *Munoz-De La O*, 2022 U.S. District LEXIS 29868 at *34.  *Munoz-De La O* further concluded, as have many other courts, that the five subsequent amendments to § 1326 were not enacted with discriminatory purpose.  *Id*. at *37.  Even Professor Kang conceded that the subsequent amendments to §1326 "are justified by public safety considerations for criminal aliens with aggravated felony convictions."  *Id.* at *39.  And the court gave no ground to the suggestion that, once tainted with racial animus, a statute is forever tainted.  *Id.* at *36-37.  In *United States v. Hernandez-Lopez*, No. H-21-440, 2022 U.S. Dist. LEXIS 18649, at *11 (S.D. Tex. Feb.

21cr3403-BEN

2, 2022), the court noted that "[e]ven Professor Kang acknowledged that 'Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act.'"  But Professor Kang interprets the silence of Congress as evidence of animus.  *Hernandez-Lopez* observes, "[Professor Kang] concludes that animus is evidenced by Congress's failure 'to examine or cleanse the anti-Mexican racism that infected the Act of March 4, 1929,' and its decisions to make the entry and reentry offenses 'easier to prosecute.'"  In other words, Professor Kang holds the opinion that Congressional silence is strong evidence of continuing Congressional animus.  To put it differently, Congressional animus endures through silence; only a public Congressional change of heart will erase a discriminatory taint.  Consequently, even when Congress was silent, racial animus could be drawn from her interpretation of the historical context.  *See* Defendant's Reply, Kang transcript, Exhibit 1, at 101.  The professor estimated that her certainty on this point was in the high 90s percentage range.  *Id*. at 101-102.  She opined that this is a scientific estimate "in the sense that I feel that the evidence is overwhelming that Congress is motivated by anti-Latino racial animus in passing this [1952] iteration of 1326."  *Id*.  The 1988 Anti-Drug Abuse Act passed 346 to 11 and increased § 1326 penalties.  It also added mandatory detention in immigration proceedings for aggravated felons.  The professor concludes there was racial animus because (in her view) one Senator was "motivated by his own racial antipathies toward Cuban and Haitian refugees and . . . responding to the deeply xenophobic sentiments of his Florida constituents."  *Id*. at 110-114.   Professor Kang next acknowledges that the legislative history of the § 1326 amendments from the Immigration Act of 1990 had no debates or hearings and that the record "was very thin." *Id*. at 115.  Concerning the 1994 law known as the Clinton Crime Bill, which again amended §1326, she sees racial animus.  The animus is not reflected in the statements of the bill's proponent, but from the statement of another Senator who criticized the notion of birthright citizenship while proposing a competing version of §1326.  *Id*. at 115-116.

21cr3403-BEN

The professor agrees that the Antiterrorism and Effective Death Penalty Act of 1996 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 both passed with no debate about amendments to § 1326.  Against this backdrop of non-debate and non-discussion while Congress repeatedly amended § 1326, Professor Kang opines that the broader historical context made it very clear that racial animus was pervasive for the amendments.  *Id.* at 122.  She explains that Congressional silence as evidence of pervasive racial animus based on her view that "there is no way that anyone would have or could have dared to have raised a challenge to 1326 during these periods of U.S. history, because it would have been political suicide . . . .  In the 1980's and '90s these congresspersons would have lost reelection if they made any attempt to expunge the racial animus for 1326 or dilute it in any way . . . .  It was in their best political interest . . . to get on the xenophobia bandwagon and propose and support anti-immigration measures in this period."  *Id.* at 122-23.  Her opinion admits no other possible explanations.  Professor Kang opines, "I am convinced that racial animus informed the passage of the 1952 McCarran-Walter Act, the 1988, the 1990, the 1994, and the 1996 laws."  *Id.* at 125-26.  This is an interpretation of what was un-said; not what members of Congress actually said.  It is a form of the enduring taint theory.

Defendant relies on *Hunter* for his enduring taint theory.  And Defendant is correct that *Hunter* struck down a 1901 Alabama law where discrimination against blacks was the "but-for" motivation for the voting disenfranchisement law and the disparate impact continued up to the present day.  471 U.S., at 231.  *Hunter* struck down the law despite more recent changes.  But *Hunter*'s law did not affect immigration, an area where Congress' power is plenary.  And the *Hunter* court did not dismiss a criminal indictment and thus was unconcerned with public safety.  Finally, there was clear evidence of discriminatory motive and continuing disparate impact existing in *Hunter*.  The same is not nearly as obvious here.

21cr3403-BEN

Defendant also relies on *Abbott v. Perez*, 138 S. Ct. 2305 (2018) for the notion that the legislature has to prove it has somehow purged some discriminatory taint attributed to a prior enactment.  But *Abbott* is a curious choice.  *Abbott* is a voter redistricting case distinguishing *Hunter*.  *Abbott* found that the lower court contravened basic principles by imposing on the state the burden of proving the legislature had "experienced a true 'change of heart' and had 'engaged in a deliberative process to ensure that the [more recent redistricting] plans cured any taint.'" *Id.* at 2325.  *Abbott* explains,

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.  "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."  The "ultimate question remains whether a discriminatory intent has been proved in a given case."  The "historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent.  But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Id.* at 2324-25 (citing *Arlington Heights*, 429 U. S., at 267 and omitting others).

Indeed, the dissent tries to make the case that the lower court's decision was okay because the lower court did not really mean to flip the burden of evidence onto the legislature to prove discriminatory taint had been later purged.  *Id*. at 2326.  But the district court had, indeed, disregarded the presumption of legislative good faith and improperly reversed the burden of proof by demanding the legislature demonstrate its change of heart.  Defendant in this case asks this Court to commit the same error by demanding Congress prove it has faced the (alleged) discriminatory roots of the 1929 Act and changed its heart in more recent enactments and amendments, thereby purging the taint.

Defendant has not shown that the 82nd Congress was motivated by a discriminatory intent when it re-enacted § 1326 in 1952.  Section 1326 was not the focus of the racist rhetoric in 1952, and President Truman's threatened veto was overturned.

21cr3403-BEN

Defendant has not pointed to any convincing evidence that the 100th Congress was motivated by a discriminatory intent in enacting the penalty provision in § 1326(b) in 1988.  The 1990 legislative history shows that the criminalization of unlawful reentry was motivated by an effort to enforce immigration laws and passed with bipartisan support.  Notwithstanding Professor Kang's one-way interpretation of history, the legislative history of § 1326 and its amendments does not reveal the racial animus needed to make out an equal protection claim under *Arlington Heights*.

## 2.   Evidence of Disparate Impact

For the third category of proof required by *Regents of the Univ. of Cal.*, 140 S. Ct., at 1915, Defendant claims that § 1326 has had a disparate impact on Hispanics.  He points out that the U.S. Sentencing Commission reports that 99.1% of those convicted of illegal reentry in 2020 were Hispanic.  *See* Defendant's Reply to Motion, at 10.  This is not a surprising figure because of: (1) a 2000-mile border the United States shares with Mexico; and (2) federal agencies reporting ethnic data define "Hispanic or Latino" as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish Culture or origin regardless of race.[5]  The Government reports that 99.1% of all Border Patrol encounters during Fiscal Year 2019 took place along the southwest border.  *See* United States' Response in Opposition at 23.  Because of the definition, it may be that 99.1% of all immigrants crossing the Mexico-United States border are Hispanic.   The Sentencing Commission statistics do not report the percentage of illegal re-entrants who are encountered, but not prosecuted.  The Sentencing Commission statistics do not report whether illegal re-entrants of other races are prosecuted more frequently or less frequently.  It reports only that of the people prosecuted and convicted, a very high

---

[5] *See,* "About the Hispanic Population and its Origin" at www.census.gov/topics/population/hispanic-origin/about.html.

21cr3403-BEN

percentage were Hispanic.  Defendant's statistic is not particularly illuminating without more information.

It may be evidence of impact, but it falls short of proving disparate impact, primarily because the proximity to Mexico and a vast imbalance of economic prosperity offers other benign explanations.  *Regents of the Univ. of Cal.* recognized the same sort of flaw in reasoning.  In that case the Court noted that for the DACA program, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." 140 S. Ct., at 1915-16.  But that is not enough for an equal protection claim to succeed.  The Court cautioned, "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."  *Id.*

Other courts have also concluded that the § 1326's large impact on Hispanics is a function of proximity to Mexico and economics rather than racial animus.  For example, in *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 U.S. Dist. LEXIS 151779, at *16 (D. N.M. Aug. 12, 2021), the court agreed that "the proximity of a very large population of Hispanics to the Southern Border, as well the political and financial realities unique to Central America, fully explain the disproportionate number of Hispanics charged with violating §1326."  It cited several decisions explaining any impact on grounds of geographic proximity, rather than race.  *Id.* (citing *Gutierrez-Barba*, 2021 U.S. Dist. LEXIS 99844, 2021 WL 2138801, at *4; *United States v. Rios-Montano*, No. 19-CR-2123 GPC, 2020 U.S. Dist. LEXIS 230122, 2020 WL 7226441, at *7 (S.D. Cal. Dec. 8, 2020); *United States v. Gallegos-Aparicio*, No.: 19-CR-2637-GPC, 2020 U.S. Dist. LEXIS 233254, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020); *United States v. Morales-Roblero*, No. 3:19-mj-24442-AHG, 2020 U.S. Dist. LEXIS 168354, 2020 WL 5517594, at *10 (S.D. Cal. Sep. 14, 2020); *United States v. Lucas-Hernandez*, No.: 19MJ24522-LL, 2020 U.S. Dist. LEXIS 195638, 2020 WL 6161150 (S.D. Cal. Oct.

17

21, 2020)).  Addressing the same statistics offered in this case, *United States v. Hernandez-Lopez* also accepted a race-neutral explanation for the impact of § 1326 on people from Mexico and Central America.  2022 U.S. Dist. LEXIS 18649, *17 (S.D. Tex. Feb. 2, 2022); *see also United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 U.S. Dist. LEXIS 214071, at *8 (N.D. Ohio Nov. 5, 2021) ("Although there is evidence that Mexican and Latinx[6] people make up the vast majority of individuals apprehended at the border, there is no evidence that they are disproportionately represented in convictions for illegal reentry under 8 U.S.C. § 1326(a)."); *United States v. Wence*, No. 3:20-cr-0027, 2021 U.S. Dist. LEXIS 112805, at *29 (D.V.I. June 16, 2021) ("[A]lthough Latinx people are likely disproportionately affected by 8 U.S.C. § 1326, the disparate impact alone in this case is not pronounced enough to give rise to an inference of discriminatory motive, given that the disparity is explainable on grounds other than race.").  Section 1326 is more about the economics of agricultural labor, together with concern for public safety, than it is about racial discrimination.  Dramatically higher wages paid to workers in the United States compel citizens of Mexico and Central America to cross the border to work to be able to provide income for themselves and their families.  The economic opportunities are irresistible to some, despite being previously deported.  Section 1326 is a mechanism that tends to protect the jobs and wages of agricultural workers who have complied with the immigration laws to achieve citizenship or permission to reside in the United States.  It does so by punishing those who re-enter unlawfully and compete with citizens and lawful permanent residents or others holding permission, a problem pointed out by none other than the agricultural labor rights leader

---

[6] "Latinx" – a term not to be found anywhere in the Hispanic community, literature, or language.  A gross cultural appropriation of a language that has proudly existed for over three thousand years.

21cr3403-BEN

Cesar Chavez.[7]  The United States, a wealthy country which shares a roughly 2,000 mile border with a "poor" country, is undoubtedly a magnet for people from Mexico and beyond.

The chance to make a better living is a constant theme among defendants who have appeared before this Court on § 1326 charges.  Many have family members who are citizens of, and reside in, the United States, and provide the attraction to re-enter illegally.  The reasons for illegal re-entry are colorblind and race neutral.  The existence and enforcement of § 1326 is likewise colorblind and race neutral.  The enhanced penalties of § 1326 for those with previous criminal convictions are also colorblind and race neutral.  The impetus is the safety of the public.  The enhanced penalties do not apply on the basis of race or suspected propensity for criminality, but upon an illegal re-entrant's actual past criminal actions.  To make the obvious point, members of no race are born with criminal convictions.  The individual who is convicted of a crime which may be unrelated to immigration laws, has demonstrated some proclivity towards crime.  Of all the aliens who re-enter the United States without permission, the ones with criminal histories, irrespective of race, pose the most direct threat to public safety.

## V.    Dismissal as a Remedy

That courts are nearly unanimous in rejecting Defendant's argument is not surprising.  Dismissing a felony indictment is a severe remedy to be administered with restraint.  *United States v. Rogers*, 751 F.2d 1074, 1076 (9th Cir. 1985) ("Because it is a drastic step, dismissing an indictment is a disfavored remedy.").  In the context of this case, hypothetically assuming that Defendant would be found guilty as charged, dismissal would mean releasing into the general public a person without a legal right to be in the

---

[7] KQED News report from September 25, 1972, featuring a videotaped interview with Cesar Chavez, in which he explains that legitimate strikes by agricultural workers can be undercut by illegal aliens from Mexico.  Found at the Bay Area Television Archive, https://diva.sfsu.edu/collections/sfbatv/bundles/189746.

21cr3403-BEN

general public who has a record of having committed a federal drug crime and disobeying prior orders of the government.  The public would be less safe and hamstrung in its ability to do something about it.  Dismissing an indictment bars prosecution altogether for the crime and interferes with "the public interest in having the guilty brought to book." *United States v. Blue*, 384 U.S. 251, 255 (1966).  If § 1326 is declared unconstitutional, the ramifications would have larger effects on the public.  Those incarcerated on §1326 convictions would be entitled to habeas corpus relief under 28 U.S.C. § 2255 and release.  Previous deportees could attempt to re-enter the United States without permission and without consequence.  The nation would be less able to achieve compliance with its deportation and removal orders.

Even in cases in which there has been a violation of the defendant's Sixth Amendment constitutional rights by interference with the attorney-client relationship, the relief has not been to dismiss the indictment.  *United States v. Morrison*, 449 U.S. 361, 364 (1981); *United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir. 1985).  Similar principles apply to other constitutional provisions.  Suppression of evidence rather than dismissal of the indictment is the remedy when evidence is found in violation of the Fifth Amendment.  *Morrison*, 449 U.S. at 365-66 & n.3 (citing *Blue*, 384 U.S. 251).  Searches and seizures in violation of the Fourth Amendment do not require dismissing an indictment; instead, the remedy is suppressing the evidence at trial.  *Rogers*, 751 F.2d at 1078.  Other than the outlier case of *Carrillo-Lopez*, Defendant cites to no case where dismissal of an indictment was the remedy for an equal protection violation.

## VI.        Conclusion

Because § 1326(a) and (b) is an immigration enforcement law, Ninth Circuit controlling authority requires the equal protection claim be scrutinized under the rational basis test.  The law passes that test.  Even if heightened, intermediate scrutiny was applied, the law would pass the test.  Alternatively, even if the *Arlington Heights* approach is used, neither racial animus nor a disparate impact has been proven by

21cr3403-BEN

convincing evidence.  Finally, even if the statute failed any of these tests, dismissal of criminal charges against a defendant with the criminal background present here is too harsh of a remedy.  Thus, like the decision of the Sixth Circuit and the decisions of the vast majority of district courts to address the question, this Court denies the motion to dismiss.

**IT IS SO ORDERED.**

Date: April 27, 2022

_____
HON. ROGER T. BENITEZ
United States District Judge

21

21cr3403-BEN